**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

_____

CATSKILL MOUNTAINS CHAPTER OF
TROUT UNLIMITED, INC.; THEODORE
GORDON FLYFISHERS, INC.; CATSKILL-
DELAWARE NATURAL WATER ALLIANCE,
INC.; FEDERATED SPORTSMEN'S CLUBS
OF ULSTER COUNTY, INC.; and
RIVERKEEPER, INC.,

                            **Plaintiffs,**

                   v.                        1:00-CV-511
                                                   (FJS/RFT)

CITY OF NEW YORK; NEW YORK CITY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION; JOEL A. MIELE, SR.,
Commissioner of Department of
Environmental Protection,

                            **Defendants.**

_____

| APPEARANCES | OF COUNSEL |
|---|---|
| **PACE ENVIRONMENTAL LITIGATION CLINIC, INC.**<br>78 North Broadway<br>White Plains, New York 10603<br>Attorneys for Plaintiffs | **KARL S. COPLAN, ESQ.**<br>**DANIEL E. ESTRIN, ESQ.** |
| **OFFICE OF CORPORATION COUNSEL – CITY OF NEW YORK**<br>100 Church Street<br>New York, New York 10007<br>Attorneys for Defendants | **HILARY MELTZER, ESQ.**<br>**WILLIAM S. PLACHE, ESQ.**<br>**SUSAN C. MOON, ESQ.** |

**SCULLIN, Senior Judge**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Currently before the Court is Plaintiffs' motion for supplemental attorney's fees in the amount of $143,305.65 and out-of-pocket expenses in the amount of $8,846.44 for work that their attorneys performed subsequent to the filing of Plaintiffs' prior motion for legal fees and expenses.

**II. BACKGROUND**

On March 31, 2000, Plaintiffs filed a complaint against Defendants alleging violations of the Clean Water Act for Defendant New York City's discharge of turbid water from the Shandaken Tunnel into Esopus Creek, a trout-fishing stream. This Court dismissed the complaint for failure to state a claim. The Second Circuit reversed that decision on October 21, 2001, finding that Defendant New York City's release of turbid water into Esopus Creek was an "addition" of a pollutant and subject to the Clean Water Act's National Pollution Discharge Elimination System ("NPDES") permitting requirements. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 493-94 (2d Cir. 2001). On remand after a bench trial, this Court assessed $5,749,000 in penalties against Defendants, ordered injunctive relief, and directed Plaintiffs to apply for attorney's fees and costs. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 244 F. Supp. 2d 41, 57 (N.D.N.Y. 2003). Subsequently, this Court awarded Plaintiffs $192,274.84 in attorney's fees and $81,964.32 in costs and granted Defendants' request to stay the award pending appeal.

Defendants appealed this Court's decision, and Plaintiffs cross-appealed. In June 2003,

Defendants requested a stay of the appeal pending the Supreme Court's grant of *certiorari* and subsequent decision in *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004). Plaintiffs filed an *amicus* brief in *Miccosukee* in support of the respondents in that case regarding the issue of whether inter-basin transfers of pollutants constitute additions under the Clean Water Act. The Supreme Court issued its decision in *Miccosukee* on March 23, 2004, and the parties completed briefing the appeal in this case to the Second Circuit in August 2004.

On August 12, 2005, Defendants filed a motion to submit a supplemental brief to the Second Circuit. Attached to the motion were the supplemental brief and a copy of an Environmental Protection Agency ("EPA") memorandum dated August 5, 2005, which posited that some inter-basin transfers of pollutants were not subject to the Clean Water Act. On August 30, 2005, Defendants requested a stay and an injunction pending appeal from this Court. On September 9, 2005, Plaintiffs filed their response. This Court did not rule on Defendants' motion, and the SPDES administrative adjudicatory hearing proceeded as scheduled on October 17-19, 2005. Plaintiffs participated in that hearing and have been active in the administrative process since its inception. Plaintiffs filed comments on the draft Clean Water Act permit that the New York State Department of Environmental Conservation ("DEC") issued, attended a legislative hearing and an issues conference, and participated as a party in the adjudicatory hearing.

On September 23, 2005, in light of the delay in scheduling oral argument and Defendants' motion in this Court to enjoin the permitting process, Plaintiffs filed a motion to expedite the appeal in the Second Circuit. Plaintiffs also filed a Freedom of Information Act request with the EPA, seeking information that might explain the basis for the EPA's new position on inter-basin

transfers of pollutants. Plaintiffs also filed a responsive supplemental brief with the Second Circuit on October 28, 2005, arguing that the EPA's memorandum was not entitled to deference and was based on a flawed interpretation of the Clean Water Act. The Second Circuit denied Plaintiffs' motion to expedite and heard oral argument on the appeal on November 21, 2005. Subsequently, the Second Circuit directed the parties to submit letter briefs regarding 33 U.S.C. § 1312 and New York's analogous variance proceeding. On June 13, 2006, the Second Circuit issued its decision affirming this Court's judgment in favor of Plaintiffs. Defendants petitioned for a *writ of certiorari*, which the Supreme Court denied.

### III. DISCUSSION

In addition to seeking attorney's fees and costs for work that their attorneys performed related to the appeal of this Court's decision, Plaintiffs also seek attorney's fees and costs for work related to Plaintiffs' involvement in the State administrative proceeding regarding the SPDES permit and related to Plaintiffs' decision to file an *amicus* brief in the *Miccosukee* case.

Defendants object to Plaintiffs' request for attorney's fees and costs, arguing that the Court should substantially reduce Plaintiffs' fee application for several reasons. *See* Declaration of Hilary Meltzer, dated April 30, 2007 ("Meltzer Decl."), at ¶ 1. Specifically, Defendants assert that the Court should not require them to pay attorney's fees and costs related to Plaintiffs' involvement in the State administrative proceedings regarding the SPDES permit or as *amicus* in the *Miccosukee* case because Plaintiffs' "participation in these proceedings was not necessary to protect their rights under, or to compel compliance with, this Court's February 26, 2003 Order . . . [and] Plaintiffs did not prevail either as *amici curiae* in *Miccosukee* or as intervenors in the

administrative SPDES permit proceedings and therefore are not entitled to fees or costs." *See id.* at ¶ 2.

For purposes of this motion, the Court will divide Plaintiffs' application into three parts: (1) fees and costs associated with the State administrative SPDES permitting proceedings; (2) fees and costs associated with the *Miccosukee* case; and (3) fees and costs associated with the appeals in this case.

### A. State administrative proceedings

In *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546 (1986), the Delaware Valley Citizens' Council for Clean Air ("Delaware Valley") and the United States filed suit to compel the Commonwealth of Pennsylvania ("Commonwealth") to implement a vehicle emission inspection and maintenance program ("I/M program") as required under the Clean Air Act. Pursuant to a consent decree approved in 1978, the Commonwealth agreed to establish an I/M program for ten counties in the Philadelphia and Pittsburgh areas by August 1, 1980. The consent decree called for the Pennsylvania Department of Transportation ("PennDOT") to seek legislation instituting a franchise I/M system under which the Commonwealth would contract with garage owners for the establishment of inspection stations. If the legislature failed to approve such a system, the consent decree required PennDOT to promulgate regulations allowing the Commonwealth to certify a number of private garage facilities to perform the inspections. In addition, the consent decree provided for the Commonwealth to pay Delaware Valley $30,000 for attorney's fees and costs incurred prior to the entry of the consent decree.

Things did not go smoothly after entry of the consent decree; and, for purposes of analysis, the Supreme Court divided the post-decree period into nine phases. Delaware Valley sought attorney's fees and costs for the work performed after issuance of the consent decree, and the District Court awarded Delaware Valley $209,813 in attorney's fees and an additional $6,675.03 in costs.

Primarily, the hours for which Delaware Valley sought compensation were those spent on the post-decree litigation. However, in Phases II and IX, the Commonwealth argued that Delaware Valley sought "compensation for work done in only tangentially related state and federal administrative proceedings." *Id.* at 554. The District Court disagreed and concluded that, "because the proposed regulations would have affected Delaware Valley's rights under the consent decree, it had a unique interest in the proceedings that made its work sufficiently related to the litigation to be compensable." *Id.* (citation omitted).

The Court of Appeals for the Third Circuit affirmed the award, finding that the work in Phases II and IX "'was useful and necessary for securing full enforcement of the decree' . . . ." *Delaware Valley*, 478 U.S. at 556 (quotation omitted). The Commonwealth sought a *writ of certiorari*, which the Supreme Court granted.

In the Supreme Court, the Commonwealth argued that "the plain language of the [Clean Air Act] clearly limits the award of fees to 'costs of litigation' for 'action[s] brought' under the Act, and that the lower courts erred in awarding attorney's fees for Delaware Valley's activities in Phases II and IX, both of which involved submission of comments on draft regulations to administrative agencies." *Id.* at 557-58. The Supreme Court rejected this argument.

The Court explained that,

> [a]lthough it is true that the proceedings involved in Phases II and IX were not "judicial" in the sense that they did not occur in a courtroom or involve "traditional" legal work such as examination of witnesses or selection of jurors for trial, the work done by counsel in these two phases was as necessary to the attainment of adequate relief for their client as was all of their earlier work in the courtroom which secured Delaware Valley's initial success in obtaining the consent decree.

*Id.* at 558.

The Court also noted that "the consent decree provided detailed instructions as to how the program was to be developed and the specific dates by which these tasks were to be accomplished." *Id.* Therefore, the Court concluded that

> [p]rotection of the full scope of relief afforded by the consent decree was . . . crucial to safeguard the interests asserted by Delaware Valley; and enforcement of the decree, whether in the courtroom before a judge, or in front of a regulatory agency with power to modify the substance of the program ordered by the court, involved the type of work which is properly compensable as a cost of litigation under § 304. In a case of this kind, measures necessary to enforce the remedy ordered by the District Court cannot be divorced from the matters upon which Delaware Valley prevailed in securing the consent decree.

*Id.* at 558-59.

Finally, the Court stated that its

> conclusion [was] consistent with [its] opinion in *Webb v. Board of Ed. of Dyer County*, 471 U.S. 234, 105 S. Ct. 1923, 85 L. Ed. 2d 233 (1985) . . . [, where the Court had] noted that for the time spent pursuing optional administrative proceedings properly to be included in the calculation of a reasonable attorney's fee, the work must be "useful and of a type ordinarily necessary" to secure the final result obtained from the litigation. . . . Application of this standard is left to the discretion of the district court. . . .

*Id.* at 561 (internal citations omitted).

The Court further explained that "the District Court [had] found that, as for Phase II, Delaware Valley had a unique interest in the proposed regulation 'based on a desire to ensure compliance with the consent decree and to protect [its] rights thereunder. The usefulness of [Delaware Valley's] comments was manifested in the revisions that were made to the original regulations.' . . ." *Id.* (internal quotation omitted). Furthermore, the Court stated that "the [district] court [had] found that counsel's work during Phase IX helped to protect the relief awarded under the consent decree, as any modification of the I/M program by the Environmental Protection Agency would have adversely affected Delaware Valley's rights under the decree. . . ." *Id.* (internal citation omitted). Finally, the Court concluded that "participation in these administrative proceedings was crucial to the vindication of Delaware Valley's rights under the consent decree and [found] that compensation for these activities was entirely proper and well within the 'zone of discretion' afforded to the District Court." *Id.* at 561 (citation omitted).

*Delaware Valley* is clearly distinguishable from this case. First, there is no consent decree in this case. Furthermore, the Court's Order, as amended, granted the following injunctive relief:

> (1) Defendants are to provide DEC with all of the information that
> DEC needs to issue Defendants a SPDES permit as soon as
> practicable after DEC requests any such information, (2) DEC is to
> complete the application process and make a determination on
> whether to issue a SPDES permit to Defendants within eighteen
> months of the date of this Order, (3) if, for any reason, DEC
> believes that it will be unable to complete the process concerning
> its determination on whether to issue a SPDES permit to
> Defendants within this time frame, DEC is to inform the Court and
> the parties to this action in writing as to the reason for the delay as
> soon as DEC realizes that there will be a delay, (4) Defendants are
> to provide the Court and opposing counsel, on the first day of each
> month, beginning March 1, 2003 and continuing until such time as

> they obtain a SPDES permit, with a written status report as to the progress they have made towards obtaining a SPDES permit and any other measure Defendants have made toward reducing the turbidity of the water being discharged through the Shandaken Tunnel, and (5) Defendants are to notify the Court and opposing counsel in writing when they receive a SPDES permit and are to file a copy of this permit with the Court . . . .

*See* Order dated March 12, 2003, at 5.

Plaintiffs do not dispute that Defendants have complied with the terms of the Court's Order. Moreover, when DEC objected to the language in the Court's February 6, 2003 Memorandum-Decision and Order that appeared to require DEC to issue a SPDES permit on the ground that this Court could not "compel DEC to issue such a discretionary permit and thereby nullify DEC's authority to deny this permit, if appropriate," *see* Order dated March 12, 2003, at 3 (citing Dkt. No. 130, Letter dated February 27, 2003, at 2) (footnote omitted), Plaintiffs advised the Court that they had no objections to the modification that DEC requested. *See id.* at 3-4 (citing Letter dated March 5, 2003, at 1).

Although Plaintiffs clearly had a right to participate in the state administrative proceedings that resulted in the issuance of the SPDES permit and to advocate for those terms that they considered necessary to protect Esopus Creek, their participation was not useful or necessary to advance this litigation or to protect the rights that they had won in this litigation. Moreover, as Defendants note, neither they nor Plaintiffs could control or dictate whether the final requirements of the SPDES permit would be because that decision was within the purview of DEC.

Under these circumstances, the Court concludes that Plaintiffs' participation in the State administrative proceedings was not necessary to enforce this Court's Order or to secure the final

results that Plaintiffs obtained in this litigation.  Therefore, the Court denies Plaintiffs' application for **$55,240.80** in attorney's fees associated with Plaintiffs' participation in the State administrative proceedings.

C.     **Plaintiffs' decision to file an *amicus* brief in *Miccosukee***

Plaintiffs argue that their "efforts in the *Miccosukee* case were . . . absolutely necessary to ensure [their] victory here.  Plaintiffs should be awarded costs for those efforts, particularly as they were made all-the-more necessary by [Defendants'] request for a stay *in anticipation of* a 'favorable' (to [Defendants]) *Miccosukee* ruling."  *See* Plaintiffs' Memorandum of Law at 11.  Plaintiffs explain further that, "[b]ased on [Defendants'] own request to postpone briefing, and on the potential calamitous effect that a negative outcome in *Miccosukee* would have had, [P]laintiffs' participation in *Miccosukee* easily meets the 'useful and necessary' test, and indeed was vital to secure and protect the judgment that [P]laintiffs had secured in this litigation."  *See id.*

Plaintiffs' argument is not very convincing.  There is always the possibility that, while a case is pending, the Supreme Court (or the Second Circuit if the case is pending in this Court) will issue a decision in another case that may impact the outcome of the pending matter.  Such a possibility, however, does not warrant a finding that a party seeking an award of attorney's fees in an unrelated case should be able to recover its attorney's fees for filing an *amicus* brief in a case in which neither it nor the party from whom it is seeking fees is a party.

Moreover, the cases that Plaintiffs cite to support their position that the Second Circuit would look favorably on awarding attorney's fees for *amicus* costs are distinguishable.  In *Wilder*

*v. Bernstein*, 965 F.2d 1196 (2d Cir. 1992), the issue was "whether the intervenor group, which contributed importantly to the formation of the settlement [that the Second Circuit] had previously approved in *Wilder v. Bernstein*, 848 F.2d 1338 (2d Cir. 1988), was entitled to such an award under 42 U.S.C. § 1988 (1988)." *Id.* at 1198. The district court had granted the award, and a panel of the Second Circuit had reversed that award. However, after granting a petition for rehearing *en banc*, the Second Circuit concluded that the intervenors were entitled to an award of attorney's fees.

As a threshold issue, the Second Circuit determined that an intervenor could be a prevailing party and that, in this particular case, the intervenors were prevailing parties. *See id.* at 1202-03. However, the Second Circuit also noted that

> there are limitations on who may intervene in a civil rights suit . . . . Since § 1988 extends fees only to prevailing *parties* in the action or proceeding, *see Morales v. Turman*, 820 F.2d 728, 732 (5th Cir. 1987) (*amicus curiae*, without intervention or standing, never participated as "party" in proceeding and is not entitled to fees despite providing beneficial input to remedy), ruling that present intervenors are prevailing parties will not open the flood-gates to *amicus curiae*, good samaritans, or even litigious meddlers so that they may "team up" and overburden the nonprevailing party with excessive attorneys' fees.

*Id.* at 1203.

Although Plaintiffs cite *Wilder* to support their position that the Court should award them attorney's fees for the work their attorneys expended on their *amicus* brief, *Wilder* supports the opposite proposition by making a very clear distinction between intervenors who are parties and *amicus curiae*, who are not.

Plaintiffs also cite *Russell v. Bd. of Plumbing Examiners of County of Westchester*, 74 F.

-11-

Supp. 2d 349 (S.D.N.Y. 1999), to support their position. The court in *Russell* began its analysis of whether to reconsider its decision that the *amicus curiae* was entitled to an award of attorney's fees by noting that the *amicus curiae* was "a trade association whose members are vitally interested in the issues which were before the Court . . . [and] [i]ts counsel contributed to the Plaintiffs' victory." *Id.* at 351.

*Russell* is clearly distinguishable from this case. Unlike the *amicus* in *Russell*, who was closely related to the parties in the case in which it filed a brief, Plaintiffs have no relationship to the parties in *Miccosukee*. Moreover, to the extent that the party on whose side Plaintiffs submitted an *amicus brief* can be said to have "prevailed," there is nothing in the Supreme Court's decision in *Miccosukee* to indicate that Plaintiffs' counsel contributed to that success in any way.

Finally, Plaintiffs cite *Gates v. Gomez*, 60 F.3d 525 (9th Cir. 1995), to support their position. *Gates* involved a civil rights class action challenging medical care, psychiatric care and conditions of confinement at the California Medical Facility and Main Northern Reception Center in Vacaville, California. The suit also challenged the care and confinement of a subclass of HIV-infected inmates. The case went to trial; and, after the plaintiffs rested their case, the parties entered into settlement negotiations that resulted in a consent decree.

As part of the consent decree, the parties agreed that the plaintiffs could seek to recover reasonable costs and attorney's fees and other expenses for work performed during the pendency of the consent decree. The plaintiffs sought fees for the work that their counsel performed preparing an *amicus* brief in another case which challenged medical and living conditions for AIDS and HIV-infected inmates at Main Northern Reception Center to protect the interests of the

class because both the class and some of the issues raised in the case in which the plaintiffs filed the *amicus* brief were identical to the sub-class and issues raised in *Gates*. The district court awarded fees for this work, and the defendants appealed. The Ninth Circuit concluded that "[t]he district court did not abuse its discretion in finding that plaintiffs' work on the . . . amicus brief was reasonably related to compliance and monitoring work under the consent decree." *Gates*, 60 F.3d at 535.

      In this case, unlike in *Gates*, there is no consent decree that requires Plaintiffs to monitor Defendants' conduct or compliance with a court order. Moreover, the case in which Plaintiffs filed an *amicus* brief, although it concerned some of the same legal issues as this case, did not involve the same parties nor the same bodies of water. Therefore, *Gates* is not dispositive of this case.

      Finally, and perhaps most importantly, in this case, there is nothing to indicate that the Supreme Court relied upon Plaintiffs' *amicus* brief as a basis for its decision. In *Miccosukee*, the issue was whether the canal and the reservoir at issue were two distinct water bodies. Both the district court and the Eleventh Circuit had rested their holdings that the Water District's pumping facility was required to obtain a discharge permit under the National Pollutant Discharge Elimination System upon the conclusion that they were. The Supreme Court did not decide that issue; rather, it vacated and remanded for further development of the factual record with regard to the accuracy of that determination.

      The parties in *Miccosukee* disagreed about whether the reservoir and the canal were two distinct water bodies or two parts of the same water body. Furthermore, if they were two parts of the same water body, the parties agreed that "pumping water from one into the other cannot

constitute an 'addition' of pollutants." *Miccosukee*, 541 U.S. at 109.  The Supreme Court agreed with this conclusion, citing with approval the Second Circuit's statement in *Catskill Mountains Chapter of Trout Unlimited, Inc. v. New York*, 273 F.3d 481 (2d Cir. 2001), that "'[i]f one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not "added" soup or anything else to the pot.'"  *Miccosukee*, 541 U.S. at 109-10 (quoting 273 F.3d, at 492).

In addition, the Supreme Court explicitly declined to decide whether the district court's test was adequate for determining whether the canal and the reservoir were two distinct bodies of water and held "only that the District Court applied its test prematurely."  *Id.* at 111.  The Court explained that

> further development of the record is necessary to resolve the dispute over the validity of the distinction between [the canal] and [the reservoir].  After reviewing the full record, it is possible that the District Court will conclude that [the canal] and [the reservoir] are not meaningfully distinct water bodies.  If it does so, then the . . . pump station will not need an NPDES permit.

*Id.* at 112.

Based upon this outcome, it is not even clear that the party on whose behalf Plaintiffs filed their *amicus* brief can be considered a prevailing party.  Thus, although it certainly was within Plaintiffs' discretion to file an *amicus* brief in *Miccosukee*, there is no authority for the proposition that, under the circumstances of this case, the Court should order Defendants to pay Plaintiffs' attorney's fees associated with doing so.  Accordingly, the Court denies Plaintiffs' application for **$20,697.75** in attorney's fees associated with their filing of an *amicus* brief in *Miccosukee*.

## C. Appeal of this Court's decision

With regard to attorney's fees and costs related to the appeal and other judicial motion practice in this case, Defendants do not challenge Plaintiffs' legal basis for recovery but they do challenge the amount Plaintiffs request on the ground that certain hours billed are excessive or relate to motions on which Plaintiffs did not prevail.  *See* Meltzer Decl. at ¶ 29.  Specifically, Defendants "object[] [to] the amount of time Plaintiffs spent research[ing], drafting and editing their July 22, 2004 brief to the Second Circuit." *See id.* at ¶ 30.  Defendants note that "[t]he intern primarily responsible for drafting [Plaintiffs'] brief spent approximately 150 hours researching, outlining, drafting, and editing the [sic] it, while Mr. Coplan spent an additional 19 hours performing drafting and review work." *See id.*  Moreover, Defendants state that "two other interns – who never billed any other hours related to this case – spent approximately 41.5 hours 'subbing and citing' the same brief."  In sum, "Plaintiffs billed a total of 210.80 hours on this brief, and seek an . . . award of $15,792.25 for a brief regarding similar issues that they had previously briefed to the Second Circuit in 2001." *See id.*

Defendants' point is well taken.  The hours for which Plaintiffs seek compensation appear to be excessive, particularly the 41.5 hours spent cite checking the brief.  Therefore, the Court will cut the total hours for which Plaintiffs' seek fees in half, resulting in 75 hours for the students who researched, outlined, drafted, and edited the brief at $65 per hour ($4,875.00); 9.5 hours for Mr. Coplan's work drafting and reviewing the brief at $175.00 per hour ($1,662.50); and 20.75 hours for the students who cite checked the brief at $65.00 per hour ($1,348.75), resulting in a total award for this work of **$7,886.25**.

Defendants "also object[] to the inclusion of the hours expended by intern Laura Boucher

-15-

resubmitting and re-serving [Plaintiffs'] improperly formatted October 28, 2005 Responsive Supplemental Brief to the Court of Appeals." *See* Meltzer Decl. at ¶ 31. Defendants argue that "Plaintiffs should be required to bear the costs themselves if they fail to file properly formatted documents in the first instance." *See id.*

The Court agrees that Defendants should not have to pay fees associated with a mistake on Plaintiffs' part. Therefore, the Court will reduce Plaintiffs' fee application by **$167.70** (2.58 student hours at $65.00 per hour).

In addition, Defendants argue that "Plaintiffs should bear the full costs of their unsuccessful motion June 17, 2004 motion [sic] requesting the same panel that had heard their appeal in 2001." *See* Meltzer Decl. at ¶ 32. Defendants also contend that "Plaintiffs should bear the full costs of their unsuccessful September 23, 2005 Motion to Expedite the Appeal." *See id.* at ¶ 33.

There is no indication that Plaintiffs made these motions in bad faith and, therefore, the fact that they lost these motions does not affect the fact that Plaintiffs prevailed in this action. Therefore, the Court denies Defendants' request to reduce Plaintiffs' award for work related to these motions.

Defendants also assert that there are entries that Plaintiffs should have coded as "Filing/Clerical," for example, certain items "pertaining [to] the appeals briefing and related motion practice[,] includ[ing] tasks performed by interns such as filling out paperwork, preparing bilingual case study, preparation and mailing of monthly reports, assembling and binding documents, printing documents, and serving and filing documents." *See* Meltzer Decl. at ¶ 34. Defendants also contend that "there are a number of charges that should be reduced by some

…
…

amount because they include both billable activities and Filing/Clerical activities. . . . Plaintiffs should categorize the time under this slip into billable and non-billable charges." *See id.* at ¶ 35.

The Court has reviewed the billing records and agrees with Defendants' assessment of these items. With regard to the purely "Filing/Clerical" tasks, which represent 22.52 hours of student time, the Court finds that these are not reimbursable hours and, therefore, reduces Plaintiffs' fee application by **$1,463.80**.

With regard to those billing slips that contain both billable and non-billable hours, the Court will disallow one-half of the 16.05 hours for which Plaintiffs seek fees and, therefore, will reduce Plaintiffs' fee application by **$521.63**.

Defendants also object to Plaintiffs being "compensated for meetings, telephone calls, correspondence or legal research when the billing slip fails to provide an even cursory description of the activities' subject matter." *See* Meltzer Decl. at ¶ 36. Such items represent 197.44 hours of student time. The Court agrees and will reduce these hours by one-half, thereby reducing Plaintiffs' fee application by **$6,416.80**.

Defendants also complain about billing slips for items, such as closing memoranda and presentations to the Clinic Board, which are clearly unrelated to this litigation – other than as part of the educational process. These items represent 14.3 hours of student time; and, therefore, the Court will reduce Plaintiffs' fee application by **$929.50**.

Finally, Defendants note that "Plaintiffs have included page twenty-five twice in the interns' billing records. If these costs have also been included twice in Plaintiffs' fees, they should be excluded as duplicative. These slips represent 5.4 hours billed by interns." *See* Meltzer Decl. at ¶ 39. It appears that Plaintiffs did, in fact, include these hours twice. Therefore,

the Court will reduce Plaintiffs' fee application by **$351.00**.

In addition to attorney's fees, Plaintiffs assert that they are entitled to out-of-pocket costs in the amount of $8,846.44. *See* Plaintiffs' Memorandum of Law at 12. Plaintiffs seek costs associated with expert witness fees, subpoena fees, mailing costs, travel costs, photocopying and printing costs, court reporter fees, and other miscellaneous expenses. *See id.* at 13.

Defendants claim that "Plaintiffs' costs should be reduced as follows: . . . [f]rom $8,646.44 to $127.83 as to exclude (1) the $7,227.61 in costs related to the SPDES proceedings, and (2) $1291.00 in costs related to *Miccosukee*." *See* Meltzer Decl. at ¶ 42.

Since the Court has denied Plaintiffs' application for attorney's fees related to the State administrative proceedings and the filing of their *amicus* brief in *Miccosukee*, the Court also denies Plaintiffs' application for costs related to those two proceedings. Accordingly, the Court will reduce Plaintiffs' application for costs to **$127.83.**

### IV. CONCLUSION

Accordingly, having reviewed the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Plaintiffs' motion for attorney's fees and costs is **GRANTED** in the amount of **$49,630.42** in attorney's fees and **$127.83** in costs; and the Court further

**ORDERS** that the Clerk of the Court shall amend the judgment to reflect this award.

**IT IS SO ORDERED.**

Dated: June 9, 2008
       Syracuse, New York

                                              Frederick J. Scullin, Jr.
                                              Senior United States District Court Judge